```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE WESTERN DISTRICT OF MICHIGAN
 2                              SOUTHERN DIVISION

 3       _____

 4       UNITED STATES OF AMERICA,

 5                        Plaintiff,

 6            v.                        CASE NO:  1:17-CR-176

 7       TIRRELL PERRY THOMAS,

 8                        Defendant.

 9       _____/

10

11                             *   *   *   *

12                          SENTENCING HEARING

13                             *   *   *   *

14

15       BEFORE:    THE HONORABLE PAUL L. MALONEY
                    United States District Judge
16                  Kalamazoo, Michigan
                    May 11, 2018
17
         APPEARANCES:
18
                 APPEARING ON BEHALF OF THE PLAINTIFF:
19
                 KATE ZELL
20               CHRISTOPHER O'CONNOR
                 Assistant United States Attorney
21               P.O. Box 208
                 Grand Rapids, Michigan  49501-0208
22
                 APPEARING ON BEHALF OF THE DEFENDANT:
23
                 HELEN C. NIEUWENHUIS
24               PEDRO CELIS
                 Federal Public Defender
25               50 Louis Street, N.W., Suite 300
                 Grand Rapids, Michigan  49503-2633
```

| | | |
|---|---|---|
| | 1 | Kalamazoo, Michigan |
| | 2 | May 11, 2018 |
| | 3 | at approximately 9:08 a.m. |
| | 4 | PROCEEDINGS |
| 09:08:41 | 5 | THE COURT:  This is File Number 17-176; <u>The United</u> |
| | 6 | <u>States of America vs. Tirrell Thomas</u>.  This matter is before |
| | 7 | the Court for sentencing. |
| | 8 | The Court's file reflects that on December 1st, |
| | 9 | 2017, the defendant pled guilty before Magistrate Judge |
| 09:08:58 | 10 | Ellen Carmody to Count One, conspiracy to commit bank fraud, |
| | 11 | contrary to 18 U.S. Code 1349 and 1344(2), and bank fraud |
| | 12 | contrary to 18 U.S. Code 1344(2) in Count Three.  The plea |
| | 13 | was accepted by this Court on December 20, 2017.  The Court |
| | 14 | accepts the plea agreement finding the charges pled to |
| 09:09:26 | 15 | adequately reflect the seriousness of the actual offense |
| | 16 | behavior. |
| | 17 | There is one objection to the presentence |
| | 18 | investigation report, which we will deal with momentarily. |
| | 19 | The Court has scored this case under the advisory guidelines |
| 09:09:37 | 20 | at Offense Level 25, Criminal History Category III, |
| | 21 | resulting in an advisory guideline range of 70 to 87 months. |
| | 22 | The record should reflect that Assistant United |
| | 23 | States Attorneys Kate Zell and Christopher O'Connor are here |
| | 24 | on behalf of the government.  Attorney Helen Nieuwenhuis and |
| 09:09:55 | 25 | Attorney Pedro Celis are here on behalf of the defendant. |

1   The defendant is present in person.

2          Miss Nieuwenhuis, have you had ample opportunity,

3   ma'am, of reviewing the presentence report with your client?

4          MS. NIEUWENHUIS:  I have, your Honor.

09:10:05  5          THE COURT:  Subject to your objection, do you

6   concur in the advisory guideline range?

7          MS. NIEUWENHUIS:  Yes.

8          THE COURT:  Thank you.

9          Mr. Thomas, is that true, sir, you've had ample

09:10:13 10   opportunity of reviewing the presentence report with your

11   lawyer?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And are you satisfied with her work and

14   representation of you?

09:10:20 15          THE DEFENDANT:  Yes.

16          THE COURT:  Thank you.

17          Ms. Zell, do you concur in the scoring?

18          MS. ZELL:  Yes, your Honor.

19          THE COURT:  Third level is at issue in light of the

09:10:29 20   Court's probation officer denying acceptance.  So let's deal

21   with that first.

22          Miss Nieuwenhuis, your objection.  You may proceed.

23          MS. NIEUWENHUIS:  Thank you, your Honor.

24          Your Honor, really this objection kind of is also

09:10:54 25   hooked into this whole role of leadership.  And from the

1    very beginning in speaking with Mr. Thomas regarding this

2    case, the defense always knew that Mr. Thomas would be

3    scored with leadership, and the issue of acceptance of

4    responsibility and obstruction kind of goes around some

09:11:19  5    statements that Mr. Thomas had made at the presentence

6    investigation meeting, and I would like to address those,

7    and really we are objecting to him not receiving acceptance

8    and for the scoring of the obstruction.  And as I said, it

9    kind of dances around this issue of leadership role.  There

09:11:52  10    were stipulated facts in the plea agreement, that were very

11    detailed, that in the defense's opinion, certainly support

12    an enhancement for leadership.  And I don't think, certainly

13    in any discussions that I ever had with Mr. Thomas that was

14    ever an issue, and as the Court can see, we have not

09:12:15  15    objected to him being scored that, because he, frankly,

16    earned it and those levels are appropriately awarded to him.

17         It's very hard to stand before the Court and kind

18    of articulate, you know, what my recollection is of what Mr.

19    Thomas said, and I'm certainly not saying that Mr. Williams

09:12:42  20    is saying something totally different than my recollection,

21    but his commentary regarding Mr. Cobb specifically I read

22    the presentence report as a little over broad in what Mr.

23    Thomas had said, and it might be simply because I've had so

24    many conversations with Mr. Thomas regarding this whole

09:13:06  25    issue.  I know that he has always said to me that he did not

know or have personal knowledge that Mr. Cobb was actually
directly making deposits of checks.  And it kind of -- that
issue kind of dove tails into the issue about whether or not
if he had told the falsehood to presentence whether or not
that's material to his case, and I think under the scenario
that we have, it's not.  He scored with leadership.  He came
in and he did talk about that he had recruited at least one
person.  We went through the proffers and he agreed that
there was a second person that he was responsible for
recruiting.  He had rented cars.  He was really the conduit
to the middleman, so to speak, to the people in Chicago.
And he arranged payments.  He made payments.  And so the
defense is maintaining that he has accepted responsibility
for his actions in this case.  And that he should be given
acceptance of responsibility on the facts of the case.

I did review quite closely the proffers of Mr. Fry
and Mr. Mosley, and Mr. Fry, at least as I interpret what he
said in his proffer, talked about that he was under the
impression there were several like separate groups kind of
doing this.  Mr. Mosley talked about that he did not know
that Mr. Cobb had been making these direct deposits of these
checks until after they were all arrested.  And so I just --
I think the main thrust of our argument is that he is not
frivolously denying leadership, and I think that's kind of
what you look at if somebody-- if we are saying he told a

1    falsehood to probation, why they would do that, whether or

2    not that would have an impact on guidelines, and here it

3    clearly wouldn't.  He had admitted already and knew he was

4    receiving leadership, and so you know, whether or not that's

09:15:29   5    a materially false statement, I don't think it's material.

6         And I'm certainly open to any questions that the

7    Court may have in regards to our arguments, your Honor.

8         THE COURT:  Thank you.  No questions at this point.

9    Thank you, Miss Nieuwenhuis.

09:15:43   10         MS. NIEUWENHUIS:  Thank you.

11         THE COURT:  Ms. Zell, go ahead.

12         MS. ZELL:  Thank you, your Honor.

13         Before I begin to address this objection, the

14    government indicated ahead of time to the Court and defense

09:16:00   15    counsel it would seek to move to admit stipulated exhibits

16    and the government would request to do that now.

17         THE COURT:  I see you violated one of the rules,

18    Ms. Zell.

19         MS. ZELL:  Oh, my apologies.

09:16:20   20         THE COURT:  Government uses numbers.

21         MS. ZELL:  Oh, I did use letters.  Now I know.

22    Thank you.

23         THE COURT:  That's okay.

24         MS. ZELL:  Okay.

09:16:34   25         THE COURT:  I'll manage.

MS. ZELL:  I will try to make it as clear as possible by using the alphabet.

THE COURT:  Go ahead.

MS. ZELL:  The government outlines in its sentencing memorandum the three statements that it feels are pretty clearly, blatantly false, and in a material way.  And I'll address materiality first.  And I think the key factor here is that the issue under determination that whatever is stated has some impact of affecting the issue under determination.  So the defense position is that because the defendant never planned to object to a leadership enhancement, that the statements he made respecting or denying leadership or denying certain amounts of knowledge of the fraud therefore are not material, because there were no guidelines issues in dispute at that point because there wasn't an objection raised.  As stated in the sentencing memo, there are plenty of decisions at sentencing that go above and beyond the actual guidelines applications, and the Court has to decide whether to go within the guidelines, above the guidelines, below the guideline, and the leadership enhancement was by no means a foregone conclusion at the time the defendant made the statements to the probation officer.

The statements in particular that the government believes are materially false, first is that Mr. Thomas did

not know that Co-Defendant Earl Cobb was involved in the

offense at the time it was occurring.  And defense counsel

believes that somehow the way it's written in the PSR

suggests that possibly the defendant could have known Mr.

09:18:13   Cobb was involved, but perhaps the probation officer didn't

ask him the right questions.  I think the way it's written

is very clear that he denied having any knowledge that Mr.

Cobb was involved at the time it was occurring.

THE COURT:  Mr. Cobb and the defendant are related?

09:18:26   MS. ZELL:  They are.  They are cousins, yes.  And

that is the defendant's own admission states that in the PSR

as well.

So I'll just kind of briefly highlight through the

exhibits that I just admitted the evidence that demonstrates

09:18:42   that at the time it was occurring, the defendant was well

aware that Mr. Cobb was involved.

The first exhibit, Government Exhibit A or 1, is a

chart, a summary chart of cell site evidence.  And the

government mentioned in its memorandum that after the

09:18:57   probation interviews, the government used a cell site expert

with FBI to really delve into the cell site information in

order to demonstrate how materially false the statements

were that the defendant made about not knowing Cobb was

involved.  And that actual cell site report is Government

09:19:13   Exhibit F, and the information from that report, instead of

1    having the cell site expert testify here at sentencing --

2    the witness testify at sentencing, defense counsel agreed to

3    stipulate to the admission of the exhibit and summary

4    charts.  So I'll just briefly go through the summary chart.

09:19:35   5    In the right-hand column you can see meetings between Thomas

6    and Chicago co-conspirators including Earl Cobb, who the

7    first false statement is about, and an uncharged defendant,

8    CM.  And as you can see, there are numerous dates in which

9    the defendant traveled to meet the Chicago co-conspirators,

09:19:54   10   including dates where Cobb himself and Thomas himself, met

11   at a location around Sawyer, Michigan.  So there was a date

12   on 12/5 where Thomas met CM and Cobb around Sawyer,

13   Michigan.  12/6, Thomas and Preston met Josiah Preston, a

14   co-defendant, met CM and Cobb first at 3:58 p.m. that day.

09:20:16   15   Then on 12/6 at 11:19 p.m., Thomas and Preston met Cobb

16   again, in Sawyer.  So twice in one day they met Cobb.  And

17   notably at 11:19 p.m., one, the cell site for CM, he was not

18   there, it was just Cobb that came from Chicago on that date

19   and time.

09:20:35   20        And then 12/7 at 6:49 p.m., Thomas and Cobb met at

21   Sawyer.  A meeting between the two of them there, and there

22   are several dates there.  There is one around Coloma,

23   Michigan, on 12/12 at 9:53 a.m., where Cobb and Thomas hit

24   off towers in Coloma, Michigan, around the same time.

09:20:57   25        These are shown in the chart with corresponding

1    dates of significant withdrawals in the fraud.  So for

2    example, on 12/5, the day that Darmesha Gunn, Desiree

3    Winfield, Elnora Snipes, Mary Radcliff all made withdrawals

4    at Firekeepers Casino that day, Thomas drove at 8:47 a.m.

09:21:19   5    and met CM north of Sawyer, and then at 3:37 p.m., and met

6    Cobb and CM north of Sawyer, Michigan.  You can see there

7    are numerous trips back and forth between Tirrell Thomas and

8    the Chicago co-conspirators, including trips where he was

9    there and others where he was alone.  So that's just cell

09:21:38   10    site evidence.

11        Next we have phone contacts between Cobb, and that

12    would be Government Exhibit C.  Just based on toll records

13    alone we have for a two month period, November 1st to

14    January 1st, two months only 17 dates of contacts on the

09:21:56   15    phone between Cobb and Thomas, and of those 17 dates, 15

16    were dates on which fraud was occurring.  So to the extent

17    there is an argument they were talking because they were

18    family members, I think it's belied by the fact that almost

19    all of their contacts, 15 of 17 days happened while fraud

09:22:14   20    activity is happening in Michigan.  Those contacts between

21    Thomas and Cobb.

22        The proffer statements of multiple individuals and

23    grand jury testimony of Josiah Preston with the government

24    would move to admit as one of the stipulated exhibits here,

09:22:32   25    that is at Government Exhibits G is Josiah Preston's

1    proffer, and H and I are the grand jury statements.

2         Josiah Preston testified he was with Thomas when

3    they went and brought money to Cobb and CM over in Sawyer

4    and also did that at Thomas's request on numerous occasions.

09:22:54  5    Additionally, Thomas explained to him that the cut of money

6    with the Chicago people was as 60/40.  Sixty to the Chicago

7    people, and including for the reason that they were taking

8    more of a risk in that Earl is how Thomas referred to him

9    was actually the one depositing the money.  So I think the

09:23:11  10   proffer statements, recognizing that those individuals are

11   not remember to testify, these statements were made and the

12   evidence from the cell sites and phone records corroborate

13   the fact that the defendant knew full well that Cobb was

14   involved.  He may not have known that Cobb was the one who

09:23:28  15   actually deposited the checks, although Josiah Preston said

16   he did learn that at some point from Mr. Thomas, but he knew

17   he was involved, he was turning over fraud assets to him in

18   various places in Michigan toward Illinois.

19         The second false statement is one that is even

09:23:46  20   clearer is that the defendant told the probation officer

21   that he only recruited Mr. Fry into the offense and even

22   said that it wasn't so much of a recruitment as he told him

23   about it.  Defense counsel points out in Mr. Fry's proffer

24   he said there were different people doing their own thing.

09:24:04  25   Mr. Fry was talking about one other person, Mr. -- RD would

1    be the initials who indeed the type of fraud he did at the

2    casino that night was not very similar to the fire cracking

3    scheme, it was a little different.  But the remainder of the

4    scheme is very consistent and coherent with all of these

09:24:19  5    defendants and the Defendant Thomas's involvement with all

6    of the other people is very clear.  So I do not think that

7    in any way downplays Mr. Fry's role in this or his

8    statements about Mr. Thomas, and we will talk about his

9    statements about Mr. Thomas momentarily.

09:24:32  10            So following the government's response to the PSR

11    through his filings, the defendant has admitted that oh,

12    yes, in addition to Mr. Fry, I also recruited Preston.  And

13    that is stated in the Record Number 524, Page ID 2675 in the

14    defendant's response following the PSR after seeing the

09:25:00  15    government's response, the defendant admitted to recruiting

16    Preston.  Then in the defendant's sentencing memorandum, it

17    evolved a little bit in the Record 536, Page ID 2922 to 23,

18    the defendant said -- admitted that he and Mr. Fry recruited

19    Preston.  So under either scenario, while speaking with the

09:25:19  20    probation officer, the defendant admits only the recruitment

21    or conversation with one person, namely Mr. Fry, but

22    following the government's disclosure of oh, additional

23    cooperators, the defendant then makes it known yes, he also

24    recruited Preston.  This is material, this is another person

09:25:37  25    who then went on to recruit numerous other individuals into

1   the scheme and make significant amounts of money for the

2   defendant and for the Chicago co-conspirators.  So that is

3   the second significant lie there.

4         The third is the defendant's denial of a

09:25:51   5   supervisory role.  And the evidence on the defendant's

6   pervasive, really ever present involvement in every aspect

7   of this fraud is evidenced both through the cooperator's

8   statements and the exhibits that were admitted.  We've

9   already talked about Exhibits A and C, respecting phone

09:26:11   10   information.  I'll point the Court's attention now to

11   Government Exhibit B. So this is a chart of text messages

12   that were sent from a recruiter who is now deceased, JS, to

13   the defendant.  And this shows the type of information the

14   defendant was collecting from the direct recruiters of the

09:26:32   15   account holders.  So Government's Exhibit B, for example, on

16   December 1st, this respect representing Co-Defendant Brenda

17   Davis.  JS sent the defendant a picture of her bank card,

18   that would be the second page, a picture of her license.

19   This is information that is then used, is conveyed to

09:26:54   20   Chicago so that the people in Chicago can deposit the

21   fraudulent money into people's accounts in Michigan.  The

22   defendant was correcting this information from the direct

23   recruiters.

24         Then we have information about DT, another subject

09:27:07   25   who is uncharged in this case, his license and information.

1    We have information about Antwan Younger, a co-defendant in

2    this case, a photograph of his account info, a photograph of

3    his license is on Page 7 of 10 of that document.  We have a

4    woman, Tiffany Sanders, a co-defendant also in this case,

09:27:30   5    her license, handwritten account number, PIN number for her

6    debit card.  Again, all of this was sent to the Defendant

7    Thomas from one of the direct recruiters, yet the defendant

8    denied he had any supervisory role except for kind of

9    telling Fry about the scheme and later recruiting Preston

09:27:50  10    with Fry.  This is another recruiter altogether who has sent

11    account information to the defendant.

12         Government Exhibit D outlines all of the vehicles

13    that the defendant either rented or owned or used to

14    facilitate transportation of the various account holders and

09:28:12  15    the direct recruiters to numerous locations.  He rented

16    vehicle, an Impala that was used on several dates to

17    transport people to Firekeepers Casino and to banks.  On

18    12/19, the defendant's minivan -- or sorry, mini van rented

19    by the defendant and the defendant's own Buick Enclave were

09:28:36  20    seen at Four Winns Casino.  And the defendant's Dodge truck

21    was used at Firekeepers Casino on 12/19.  So there are

22    numerous instances where the defendant helped facilitate the

23    fraud by using vehicles to get people there.

24         Government Exhibit E are the surveillance images.

09:29:01  25    The defendant regularly, as said in the proffer reports and

1    other statements that were attached or that are submitted

2    here, that the defendant didn't necessarily always go

3    inside, but was outside in a parking lot in his vehicle

4    while fraud was occurring in various places.  These are

09:29:20   5    numerous dates where the defendant was seen inside with

6    several different people.  The first instance is on December

7    1st, was account holder, Kevin Hunter.  The defendant was

8    inside the casino at that time.  He is seen in that second

9    picture on the page there in the red and the black, and the

09:29:39   10   second page he is with Hunter, he is with Mr. Fry.  Clearly

11   he is aware of what is going on, and then you see the white

12   Impala on Page 3 of that exhibit.

13          On Page 4 of that exhibit, the incident where

14   Darmesha Gunn and Desiree Winfield were making withdrawals.

09:29:57   15   The defendant was also there in the casino at that time, and

16   he is captured on the surveillance on the top of Page 5

17   there, and this was with a completely different mid-level

18   recruiter, Jerome Perry, who the defendant presumably does

19   not know, yet was with him that night and did not mention

09:30:15   20   that to the probation officer.

21          THE COURT:  You don't think that's a coincidence?

22          MS. ZELL:  I do not think all of these incidents

23   are coincidental.

24          And then on the final page of that exhibit, there

09:30:24   25   is the deceased recruiter, JS, with the defendant in the

passenger's seat while they are making withdrawals from

Antwan Younger's account.  And then the numerous statements

of the cooperating defendants.  We have discussed Josiah

Preston briefly, and as mentioned, the government provided

these in advance both to the Court and defense counsel for

review, and the involvement, the supervisory role of Thomas

is just evident throughout each of these, that he was the

person to whom everybody turned over their money, he was the

one connecting and talking regularly with Chicago, he was

the one really keeping tabs on people as they went inside

casinos, who was worried when things weren't going right and

had to sort of face the kind of conversation with the

Chicago folks when things weren't going well.  That Kyle

Mosley, just to respond to one thing defense counsel said,

Kyle Mosley did not know Earl Cobb was depositing checks in

Chicago is irrelevant, he was not a leader in the scheme by

any means, and that speaks nothing to whether Thomas knew

his own cousin was involved in the scheme.  There is no

suggestion that Mosley actually has met or dealt directly

with Cobb.

        So for these reasons, the government believes that

the defendant's obstruction -- that these three statements

in particular were false.  They are materially false,

because they are intended to impact this Court's decision in

term of what the appropriate sentence should be, whether it

be within the guidelines, above or below the guidelines, for

that reason the government believes the obstruction of

justice enhancement is appropriate, and the defendant is

not-- he should not be getting responsibility -- acceptance

09:32:04   of responsibility credits at all.

Thank you.

THE COURT:  Thank you.  So Ms. Zell, you're moving

A through L?

MS. ZELL:  Yes, the government would move to admit

09:32:16   A through L.

THE COURT:  Mr. Nieuwenhuis?

MS. NIEUWENHUIS:  I agreed with the government,

your Honor.

THE COURT:  Government Exhibits A through L are

09:32:21   received.

Miss Nieuwenhuis, you may go ahead.

MS. NIEUWENHUIS:  Well, your Honor, the defense has

stipulated to these exhibits because the phone records are

the phone records.  It still does not absolutely prove

09:32:43   exactly how much Mr. Thomas knew about Mr. Cobb.  They are

cousins, however, they are -- they do not live in the same

town, and yes, there are conversations around when these

incidences occurred, and Mr. Thomas is not saying he wasn't

involved and deeply involved and deserved the supervisory

09:33:08   role.  And so I would just point out, I don't know if the

1    government misinterpreted a little bit of our sentencing

2    memorandum, we are not saying that Mr. Thomas is standing

3    here telling the Court that these were just, you know,

4    family contacts with Mr. Cobb, that's not the case, your

09:33:25  5    Honor, and I don't think Mr. Thomas has ever said that, your

6    Honor.

7          THE COURT:  The Application Note 1 of the

8    acceptance guideline saying, "A defendant who falsely denies

9    or frivolously contests relevant conduct that the Court

09:33:50  10    determines to be true has acted in a manner inconsistent

11    with acceptance."

12          MS. NIEUWENHUIS:  Uh-huh.

13          THE COURT:  How do you view the denial that your

14    client knew that Mr. Cobb was a co-conspirator impacts that

09:34:13  15    sentence?

16          MS. NIEUWENHUIS:  Well, if we take that, that is

17    exactly what Mr. Thomas said, that is very problematical.

18    However, like I said, and I--

19          THE COURT:  But do you want Mr. Williams to

09:34:28  20    testify?  I mean if it's boiling down to what Mr. Williams

21    understood Mr. Thomas to say, then we can have Mr. Williams

22    testify and we can have Mr. Thomas testify.  Obviously he

23    didn't have to testify if he doesn't want to, but if there's

24    a contest on that matter, do you want a record made or not?

09:34:53  25          MS. NIEUWENHUIS:  No, your Honor.

1          THE COURT:  So I can assume that the report

2    accurately reflects the conversation?  I mean it's either

3    one or the other.  Either the report is accurate or you wish

4    to contest it.

09:35:11    5          MS. NIEUWENHUIS:  I said I do believe that the

6    report certainly reflects what Mr. Williams recalled that

7    conversation.

8          THE COURT:  Because it's got to be one or the

9    other.  Defense takes the position that the report is

09:35:23   10    accurate or the report is not accurate, and then to the

11    extent that there may be some contest about that, then I

12    think the way to solve that is have Mr. Williams testify.

13    But if you are in a position to say that the report is

14    accurate, that takes care of it for me.

09:35:43   15          MS. NIEUWENHUIS:  I do believe the report is

16    accurate and that that is the recollection of the Probation

17    Officer Williams, your Honor.

18          THE COURT:  All right.  That's fine.

19          MS. NIEUWENHUIS:  And like I said--

09:35:53   20          THE COURT:  What about this notion of only

21    admitting at first until the government tips their hand as

22    to exactly what they know, that the only person he recruited

23    was Mr. Fry and then the government makes a submission to

24    the Court and all of the sudden Mr. Thomas decides, oh yes,

09:36:09   25    I recruited Preston too.

1            MS. NIEUWENHUIS:  I discussed this even before the

2      Court was given documents, your Honor, with Mr. Thomas, he

3      did agree with me he had recruited him.  And whether or not

4      that was something that he just did not say at his

09:36:26   5      presentence interview, it is what it is.  But he certainly

6      readily admitted that to me.  And I know I'm kind of beating

7      a dead horse, but I just want the Court to be very aware

8      that if we are looking at, you know, what things Mr. Thomas

9      was saying in regards to try and limit I guess his exposure

09:36:53   10     on guidelines or whatever, the whole issue around his

11     knowledge and leadership, he knew from day one he was going

12     to be scored with that.  We have a stipulated fact pattern.

13            THE COURT:  That's really not the inquiry on

14     acceptance, is it?  If you falsely deny relevant conduct,

09:37:08   15     that's problematic for getting acceptance.  It's not the

16     application of a four level enhancement for being a leader.

17     It's falsely denying relevant conduct, it seems to me, that

18     the scope of the number of conspirators, including a person

19     who happens to be the defendant's cousin is material to the

09:37:33   20     scope of the conspiracy, and therefore, it's relevant

21     conduct, and to the extent that there is a false denial of

22     that, that's problematic, it seems to me.

23            MS. NIEUWENHUIS:  Well, and I would just, I guess,

24     respectfully disagree only because from day one in my

09:37:53   25     discussions with Mr. Thomas I find it very hard to, I guess,

1   wrap my head around the fact that he would lose acceptance

2   over something -- his statements being interpreted that it

3   was going to affect his guidelines when he knew he was

4   getting scored.  That's really the point I wanted to make

09:38:14   5   for the Court, your Honor.

6           THE COURT:  All right.  Thank you.

7           MS. NIEUWENHUIS:  Thank you.

8           THE COURT:  The objection of the defendant is

9   overruled.  The Court is does not intend to give Mr. Thomas

09:38:25  10   acceptance.  I think the false statements outlined by Miss

11   Zell during the course of her presentation, especially as it

12   relates to the fact that the assertion to the Court's

13   probation officer that Mr. Thomas didn't know Mr. Cobb was

14   involved.  Mr. Cobb and Mr. Thomas are cousins.  The

09:38:45  15   government has a mountain of evidence that Mr. Thomas must

16   have known that Mr. Cobb was involved in this conspiracy.

17   Then the other piece of particular note for the Court is

18   that in terms of falsely denying relevant conduct, he only

19   recruited Mr. Fry until the government makes a filing, oh

09:39:11  20   yeah, I recruited Preston too.  This is not a person who is

21   telling the entire truth regarding relevant conduct.  Now,

22   he could have stayed silent and would have been in a

23   different position, but he affirmatively lied to Mr.

24   Williams during the course of his interview, and in Court's

09:39:36  25   judgment, the test is falsely denying relevant conduct.  And

1    in this case, the scope of the conspiracy and the identity

2    of the conspirators is relevant conduct as far as the Court

3    is concerned, and this defendant falsely denied relevant

4    conduct, clearly within the contours of Application Note 1.

09:39:58  5    The exhibits that the government has provided to the Court

6    prove beyond any pervenitur that Mr. Thomas's theory here,

7    at least in part, as presented to the probation officer is

8    fiction.

9         So with that, the objection is overruled.  The

09:40:27 10   Court finds that the advisory guideline range is 70 to 87

11   months.

12        With that, allocution, Ms. Zell.

13        MS. ZELL:  Thank you, your Honor.

14        Having walked through much of the evidence already

09:40:43 15   that the government has admitted with those exhibits, the

16   government believes that a sentence within the guidelines

17   range of 70 to 87 months is appropriate in this case.  The

18   defendant was the leader of the Michigan cohort of this

19   fraud, which was expansive.

09:40:58 20        There was a significant loss amount in the overall

21   scheme, intended loss is over $700,000 for the checks

22   deposited by the defendant's cousin over in Chicago.  With

23   respect to the Michigan people alone, over $400,000 in

24   fraudulent checks deposited.  The defendant was always

09:41:15 25   there.  He was over in-- I believe there is maybe one or two

instances where he was not at the casino, Firekeepers, but

drove over to MGM casino.  He was at Firekeepers Casino.  He

was, his vehicles were at Gun Lake.  He drove and handed

over significant quantities of money, thousands of dollars

09:41:35   to the Chicago co-conspirators.  He did all of this after

multiple prior federal convictions -- or multiple prior

convictions, and the defendant clearly has not learned from

his previous time in federal prison that he cannot continue

to lead a-- to participate in crime and lead a life of

09:41:53   crime.  He has evolved.  He has sort of changed how he has

been committing crime, but he is in no way kind of turned

away from that lifestyle, and this is an expansive fraud

where he was the leader of it.  He was someone who got other

people involved, who then got other people involved, and the

09:42:12   consequences on the lives of the account holders in this

case, on all of the people that the defendant was directly

involved with and responsible either for recruiting or for

overseeing is expansive here, and the defendant himself

needs to be specifically deterred from continuing to engage

09:42:31   in crime, and there is also a matter of general deterrence

here at issue with people who attempt to commit crimes like

this that may seem easy in order to get a bunch of money,

you could do something, you know, very simple in perhaps

their eyes, but that is a very serious concern, and it needs

09:42:47   to be communicated to the public that this type of crime

1   will not be tolerated in this district.

2          The defendant needs to learn respect for the law.

3   He needs to be specifically deterred, and a sentence within

4   the guidelines range would provide just punishment here for

09:43:03  5   the very serious offense the defendant committed.  Thank

6   you.

7          THE COURT:  Thank you, counsel.

8          Miss Nieuwenhuis, I should state for the record

9   that I have had the benefit of the defendant's sentencing

09:43:13 10   memorandum, which is ECF 536, the government's sentencing

11   memorandum, which is ECF 537.

12          So with that, Miss Nieuwenhuis, you may proceed.

13          MS. NIEUWENHUIS:  Your Honor, and I understand that

14   the Court has not granted acceptance.  We did also

09:43:33 15   specifically object to the enhancement of obstruction of

16   justice, and just for appellate purposes I'm wondering if

17   the Court could just make a very short ruling on that.

18          THE COURT:  Oh, absolutely.  The obstruction is

19   clear as far as the Court is concerned based on the same

09:43:50 20   record, so.

21          MS. NIEUWENHUIS:  Okay.

22          THE COURT:  Then of course, when you get an

23   obstruction enhancement, the guidelines have certain things

24   to say about getting acceptance, but I think this is

09:44:02 25   independent.  Whether or not I follow that guidance from the

1  sentencing commission, it's clear to the Court that Mr.

2  Thomas should get obstruction and he should get acceptance,

3  so.

4       MS. NIEUWENHUIS:  And I understood that, your

09:44:14  5  Honor, I just wanted.

6       THE COURT:  And I appreciate.

7       MS. NIEUWENHUIS:  I wanted that clarified on the

8  record.

9       THE COURT:  Thank you very much, I appreciate your

09:44:21  10  bringing that to my attention.

11       MS. NIEUWENHUIS:  Your Honor, Mr. Thomas is 39

12  years old, your Honor.  He is very close to two brothers

13  that he cares for.  They are severe diabetics and receive

14  dialysis.  He has been kind of their home care nurse.  Mr.

09:44:48  15  Thomas himself has numerous health issues, he has diabetes,

16  high blood pressure, and he does have an issue that came up,

17  and the Court had adjourned sentencing originally for that

18  he is looking and seeking treatment for as well, your Honor.

19       I would like to talk a little bit about Mr.

09:45:18  20  Thomas's upbringing.  He really had no relationship with his

21  father.  His father much of the time was incarcerated.  He

22  had heavy addictions of marijuana and cocaine.  But the

23  defendant's mother was very supportive with Mr. Thomas.  Mr.

24  Thomas himself has five children.  He has indicated that he

09:45:44  25  has an addiction to gambling.  He did earn his GED.  He

1    worked at Martin and Associates Environmental from 2012 to

2    2016 and then quit to care for his brothers, your Honor.  He

3    is very interested in vocational training.

4           He has been on bond for a long time, since August

09:46:09  5    28th of 2017.  He is interested in, if the Court would

6    consider recommending Milan facility, they have the life

7    skills course there, and he is very interested in taking

8    that, your Honor.

9           THE COURT:  All right.  Thank you, counsel.

09:46:26 10           MS. NIEUWENHUIS:  You're welcome.

11           THE COURT:  Mr. Thomas, is there anything you wish

12    to say in your own behalf, sir?  You may proceed as you

13    wish.

14           THE DEFENDANT:  Yes.  I want to say, I take full

09:46:35 15    responsibility of this crime that I committed, and you know,

16    I could have had a lot of my family here and stuff, but I'm

17    really disgusted with myself on getting -- putting myself in

18    another bad situation once again, you know.  And it ain't no

19    excuse, but I didn't think that it was going to turn out to

09:46:58 20    be what it is, and I'm not saying it to be an excuse.  I was

21    scammed too, you know, told other things to make fast money,

22    and then it turned around to be this, which I'm taking full

23    responsibility for, but I didn't know that it was going to

24    happen the way it did happen.

09:47:15 25           Once again, like she had said, I want to take the

1      life connection program, find me a religion.  It's just time

2      for me to change, you know.  I don't know.  I just they say

3      I haven't learned, but in reality, I have learned, you know.

4      It's just criminal thinking just, I don't know.  I don't

09:47:40   5      even know what to say, but I know might not believe me

6      whatever, but I have learned a lesson and one thing about --

7      I wanted to mention was what they did in Chicago, I didn't

8      know how everything worked out in Chicago, but I did -- like

9      they didn't tell me, we doing this to do this to do this, or

09:48:05  10      deposit checks.  I didn't ask who deposited checks.  I

11      didn't care honestly, I was just trying to get fast money so

12      when they did ask me if my cousin, Earl Cobb, had deposited

13      checks, you know what I'm saying, I didn't know what was all

14      going on, because I wouldn't have deposited no checks on

09:48:26  15      camera just go in guilty automatically, you know.

16          That's basically it.  And once again, I really want

17      to do this religious program, find something different for

18      me to do, try something different.  I took the drug program,

19      that helped me a lot.  So I want to try religious program.

09:48:49  20      Plus I got two new children, close to home.  And that's it,

21      I'm just recommending if I can go to take that religious

22      program, and sorry to the Court, and I reached out to a

23      couple people that I did feel like I kind of ruined their

24      life or, you know, gave them felonies or got them in a

09:49:11  25      messed up situation, but I don't know.  I guess that's it.

1          THE COURT:  Thank you, sir.

2          Miss Nieuwenhuis, what was the name of the program,

3     Life Connections?

4          MS. NIEUWENHUIS:  I think it is actually Life

09:49:27  5     Connections, your Honor, I believe I said Life Skills, but I

6     believe it's Life Connections, your Honor.

7          THE COURT:  Thank you.  You may be seated, Mr.

8     Thomas.

9          It is the Court's duty to impose a sentence

09:49:35  10    sufficient, but not greater than necessary to comply with

11    the purposes of sentencing set forth in 18 U.S. Code

12    3553(a).

13         The Court recognizes the guidelines are advisory to

14    the Court, but I have taken the guidelines into account as

09:49:48  15    an initial benchmark or starting point when sentencing in

16    this case.

17         I recognize I must make an individualized

18    assessment based on the facts presented.  The guideline

19    range is one of the array of factors warranting

09:50:00  20    consideration.

21         I also fully recognize my discretion in determining

22    an appropriate sentence as recognized by the United States

23    Supreme Court in its decisions in Booker, Kimbrough, Rita,

24    Gall, Spears, and the Sixth Circuit case of Herrera-Zuniga.

09:50:13  25         Pursuant to Tapia vs. The United States, at 131

1    Supreme Court 2382, the Court recognizes that imprisonment

2    is not suitable for the purpose of promoting correction and

3    rehabilitation.

4         I have considered all of the defendant's arguments

09:50:28  5    in support of his request for a lower sentence.

6         The 3553 factors are the nature and circumstances

7    of the offense, and the history and characteristics of the

8    defendant.  The sentence must reflect the seriousness of the

9    offense; promote respect for law; provide just punishment

09:50:43  10   for the offense; afford adequate deterrence to criminal

11   conduct; to protect the public from further crimes of the

12   defendant; provide the defendant with needed -- provide the

13   defendant with needed medical, educational, and/or

14   correctional treatment; the need to avoid unwarranted

09:50:58  15   sentencing disparity among similarly situated defendants;

16   any guideline policy statements that pertain; and the kinds

17   of sentences available to the Court.

18        First, as far as recommendations to the Bureau of

19   Prisons is concerned, the Court notes that Mr. Thomas does

09:51:15  20   have some medical conditions that need attention while he is

21   incarcerated.

22        Second, that he receive vocational/educational

23   opportunities.  He has specific interest in the Life

24   Connections program, and while the Court will not recommend

09:51:31  25   a specific facility, I think to the extent Mr. Thomas

believes this program will help him, with a recommendation
to the Court, the Court hopes that he can be assigned to a
facility that does have that program.

Third, the defendant, to say that this defendant
has thinking errors would be a gross understatement.  This
defendant needs cognitive behavioral treatment program while
he is in the institution as well.

The Court recognizes that Mr. Thomas had a
difficult childhood.  And I'm sure that poses part of the
picture here, but at some point, the citizens of the Western
District of Michigan are entitled to have Mr. Thomas be a
law abiding citizen.  This is his third felony conviction in
this district.

He apparently has learned nothing from his prior
experiences in the federal court.  He started his
involvement in this offense almost immediately after being
released from supervision on his second federal felony.  To
say that specific deterrence is an issue here for the Court
to consider is one that is extremely important, as far as
the Court is concerned.  Not that I haven't considered all
of the other 3553 factors, but this is a major circumstance,
as far as the Court's concerned.

Protection of the public from further crimes of the
defendant.  As I said before, this is his third felony
conviction in this district.

1           His Criminal History Category is III.  He is a

2    relatively young man at age 39 or 40.  He is doing life on

3    the installment plan, and unless he starts thinking in a

4    different way and decides to be a law abiding citizen.  He

09:53:49  5    impresses me as a very intelligent person.  Unless he starts

6    making better decisions for himself, which are pro-social

7    and staying on the right side of the law he is just going to

8    continue to be incarcerated.

9           His performance, and I'll say the word performance,

09:54:08  10   his performance at the interview with Mr. Williams was a

11   sight to behold.  I mean when it's in his interests to tell

12   the truth, he lies.  That's not good.  That's a bad

13   decision.  And that's why he got obstruction, and that's why

14   he got acceptance.  I hope Mr. Thomas takes that to heart.

09:54:32  15   That he needs to tell the truth.  This fraudulent conduct

16   here, Mr. Thomas related something about other people

17   getting involved in this scheme, and I fully recognize Mr.

18   Thomas didn't recruit all of these people, but he got a four

19   level enhancement for his role and the number of individuals

09:54:54  20   who are now federal felons because of Mr. Thomas'

21   involvement in this conspiracy with others is staggering.

22   They had no record, and because others preyed on them

23   because they needed money, they are now federal felons.

24          The guidelines, in the Court's judgment, the

09:55:24  25   guideline range is insufficient to address just punishment,

1    specific deterrence of Mr. Thomas, and protection of the

2    public from further crimes of the defendant.  I also must be

3    mindful of general deterrence of others who might

4    contemplate similar criminal activity.

09:55:47  5        This was a massive fraud in the Western District of

6    Michigan and multiple locations, with multiple people, and

7    Mr. Thomas was at the pinnacle of this scheme with a four

8    level enhancement for his role in it.  So the nature and

9    circumstances of the offense, among other factors including

09:56:11 10   the ones I've already have outlined, the Court believes that

11   a variance from the advisory guideline range, based on those

12   3553 factors are attendant to this particular case, a

13   variance upward of two levels results in a guideline range

14   of 87 to 108 months, and it's the Courts's intention to

09:56:40 15   impose a sentence towards the upper end of that guideline

16   range.

17        Accordingly, it's the judgment of the Court the

18   defendant is committed to the custody of the Bureau of

19   Prisons for a term of 102 months on each Count One and

09:56:54 20   Three, to be served concurrently.

21        Upon release from imprisonment, the defendant shall

22   be placed on supervised release on both counts for four

23   years, those terms to be run concurrently.

24        Within 72 hours of release from custody of the

09:57:08 25   Bureau of Prisons, the defendant shall report in person to

1    the probation office in the district to which he is

2    released.

3              While on supervised release, the defendant shall

4    comply with the mandatory and standard conditions of

09:57:20  5    supervision, including DNA collection, drug testing, he is

6    not to possess any firearms, destructive devices, or

7    dangerous weapons.

8              Additionally, the defendant shall comply with the

9    following special conditions of supervision:

09:57:32  10    Participate in a program of testing and treatment

11    for substance abuse as directed.  Follow the rules of the

12    program until such time as he is released from the program

13    by his probation officer, and pay at least a portion of the

14    cost according to his ability to pay, as determined by his

09:57:46  15    probation officer.

16              He must not use or possess any controlled

17    substances without a valid prescription.  If he has a valid

18    prescription, he must follow the instructions on the

19    prescription.  He must not possess, use, or sell marijuana

09:58:00  20    or any marijuana derivative, including THC in any form

21    including edibles or for any medical purposes.  He is also

22    prohibited from entering any marijuana dispensary or grow

23    facility.

24              He must provide his probation officer with access

09:58:17  25    to any requested financial information authorize the release

of financial information, and the probation office will
share financial information with the United States
Attorney's Office.

He must participate in a cognitive behavioral
treatment program as directed.  Follow the rules of that
program until such time as he is released from the program
by his probation officer, and pay at least a portion of the
cost according to his ability to pay.

He must not frequent any establishment where
gambling is conducted legally or illegally.  He must not
participate in gambling in any form including, but not
limited to Lottery, on-line wagering and sports betting.  He
must participate in a gambling addiction treatment program
as directed and follow the rules of that program, and pay
the costs of the program, if he is financially able.

No cell phone or other electronic device without
the prior permission of his probation officer.  If he is
given permission to have a cell phone or other electronic
device.  The device must be in his name or a name approved
in advance by his probation officer.  And he shall provide
the monthly bill for the device with each monthly report.

The Court finds the defendant does not have the
ability to pay a fine.  The restitution ordered is
$214,286.03 payable to Bank of America.  The special
assessment of $200 total, that is $100 on each count, is

offered due and payable immediately.

Miss Nieuwenhuis, any other recommendations to the Bureau of Prisons that you would like?

MS. NIEUWENHUIS: No, your Honor, thank you.

10:00:11 THE COURT: Any legal objection to the sentence imposed, other than the ones already stated on the record?

MS. NIEUWENHUIS: No, your Honor, but I guess for the record, we would object to the upward variance.

THE COURT: All right. Thank you.

10:00:25 Miss Zell, any legal objections to the sentence imposed?

MS. ZELL: No, your Honor.

THE COURT: Miss Nieuwenhuis, are you satisfied I have addressed all of your arguments on the record?

10:00:32 MS. NIEUWENHUIS: I believe the Court has, your Honor.

THE COURT: All right. Thank you.

Miss Zell, are there counts to be dismissed?

MS. ZELL: Yes. The government would move to

10:00:37 dismiss Counts 2, 4 through 22, and 24 through 26.

THE COURT: Those counts are dismissed pursuant to the plea agreement.

Mr. Thomas, I advise you, sir, you can appeal your conviction if you believe that your guilty plea was somehow

10:00:51 unlawful or involuntary or if there's some other fundamental

defect in the proceeding not waived by your guilty plea.

You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think the sentence is contrary to law.  You have the right to apply for leave to appeal in forma pauperis if you are poor.  If you wish to do so, with a few exceptions, you need to file the appropriate documents within 14 days of the entry of the judgment in this case.

Your attorney will prepare and file a notice of appeal upon your request.

Counsel is advised of her obligation to advise her client of his appellate rights.  Should your client wish to pursue an appeal, the forms for filing an appeals can be found on this Court's website or the Court of Appeals' website.

Should your client choose to appeal, you are obligated to continue representation of him until such time as you are specifically relieved by the Court of Appeals.

Defendant is remanded to the custody of the marshal for execution of sentence.

Miss Zell, anything further?

MS. ZELL:  No, your Honor.  Thank you.

THE COURT:  Miss Nieuwenhuis?

MS. NIEUWENHUIS:  No, your Honor.  Thank you.

THE COURT:  All right.  Defendant is remanded to

1      the custody of the marshal for execution of sentence.

2              COURT CLERK:  All rise, please.

3              Court in recess.

4         (At 10:02 a.m. proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                   C E R T I F I C A T E

4

5        I, Kathleen S. Thomas, Official Court Reporter for the

6   United States District Court for the Western District of

7   Michigan, appointed pursuant to the provisions of Title 28,

8   United States Code, Section 753, do hereby certify that the

9   foregoing is a true and correct transcript of proceedings

10   had in the within-entitled and numbered cause on the date

11   hereinbefore set forth; and I do further certify that the

12   foregoing transcript has been prepared by me or under my

13   direction.

14

15

16                       /s/

17                   _____

18                       Kathleen S. Thomas, CSR-1300, RPR
                          U.S. District Court Reporter
                          410 West Michigan
19                       Kalamazoo, Michigan    49007

20

21

22

23

24

25